Sander R. Dawson, Bar No. 302431
Aaron Dawson, Bar No. 283990
DAWSON & ROSENTHAL, P.C.
3200 Fourth Avenue, Suite #200
San Diego, California 92103
Telephone: (928) 282-3111
dandr@dawsonandrosenthal.com

Lisa S. Kantor, State Bar No. 110678
KANTOR & KANTOR, LLP
19839 Nordhoff Street
Northridge, California 91324
Telephone: (818) 886-2525
lkantor@kantorlaw.net

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| Alberto Vincent Poggio, an individual;<br><br>    Plaintiff,<br><br>v.<br><br>United States Office of Personnel Management, a federal agency;<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**(ADMINISTRATIVE PROCEDURE ACT – REVIEW OF AGENCY DECISION ON FEHBA CLAIM)** |

### A. Preliminary Allegations

1. Plaintiff Alberto Vincent Poggio brings this action against Defendant United States Office of Personnel Management (OPM) for review of a federal agency decision pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et. seq.*, and the Federal Employee Health Benefits Act ("FEHBA"), 5 U.S.C. § 8901 *et. seq.*

2. This Court has jurisdiction pursuant to 5 U.S.C. § 702 and 5 U.S.C. § 8912.

3. Venue is proper in this District under 29 U.S.C. § 1391(e).

4. Plaintiff is an adult individual residing in Dana Point, Orange County, California.

5. Under the FEHBA, Defendant OPM contracts with qualified insurance carriers to

provide health benefits to current and retired federal employees and is subject to suit under 5 U.S.C. § 703, 5 U.S.C. § 8912, and 5 C.F.R. § 890.107.

6. Throughout the period during which the below facts and allegations occurred, Plaintiff was a retired federal employee who selected health coverage for himself and his dependents with Blue Cross Blue Shield (BCBS) under the BCBS Service Benefit Plan, aka the Federal Employee Program (FEP), offered pursuant to BCBS's contract (CS 1039) with Defendant OPM under the Federal Employees Health Benefits Program (FEHBP). Plaintiff is entitled to bring this action under 5 U.S.C. § 8905 and 5 C.F.R. § 890.107.

7. Pursuant to 5 C.F.R. § 890.105, CareFirst BlueCross BlueShield (the "Plan") was responsible for processing benefit claims, making initial claims decisions, and reconsidering claim denials. Defendant OPM was responsible for reviewing adverse claims decisions and issuing final administrative decisions.

8. The Plan denied benefits for air ambulance transport services that Continental Medical Transport, LLC, dba Jet Rescue, provided on June 25, 2017, totaling $1,245,690.00. The Plan denied benefits as not medically necessary and denied reconsideration on May 23, 2018.

9. A covered individual whose claim has been denied by a carrier must appeal to OPM before bringing a civil action seeking review of such denial. 5 C.F.R. § 890.107(c). Defendant OPM upheld the denial on January 2, 2019.

10. Plaintiff exhausted all administrative remedies required under the FEHBA, including the required carrier- and OPM-review processes.

**B. Facts**

11. At all relevant times, Poggio has been insured under the FEP, policy no. R25816658.

12. At all relevant times, Poggio has been continuously insured under this insurance policy and has paid all premiums due and owed.

13. The benefits available to Poggio under the Policy are described in a Service Benefit Plan brochure, which represents the bilateral negotiations between the Plan and the Office of Personnel Management and is the official statement of benefits under the Federal Employees Health Benefits Program. The Plan is required to administer benefits according to the

definitions, limitations, and exclusions set forth in the brochure.

14. The Policy provides that Poggio is entitled to benefits when living or traveling outside of the United States and guarantees "benefits for transport services to the nearest hospital equipped to adequately treat [his] condition when the transport services are medically necessary."

15. The Policy also provides for emergency evacuation services to the nearest facility equipped to adequately treat a medical condition.

16. The brochure defines medical emergency as the sudden and unexpected onset of a condition or an injury that you believe endangers your life or could result in serious injury or disability and requires immediate medical or surgical care. Some problems are emergencies because, if not treated promptly, they might become more serious; examples include deep cuts and broken bones. Others are emergencies because they are potentially life threatening, such as heart attacks, strokes, poisonings, gunshot wounds, or sudden inability to breathe. There are many other acute conditions that may be determined to be medical emergencies – what they all have in common is the need for quick action.

17. The Policy provides benefits for medically necessary services which the brochure defines as health care services that a physician, hospital, or other covered professional or facility provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease, or its symptoms, and that are:

    a. In accordance with generally accepted standards of medical practice in the United States, meaning standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community and physician specialty society recommendations; and

    b. Clinically appropriate, in terms of type, frequency, extent, site, and duration; and considered effective for the patient's illness, injury, disease, or its symptoms; and

    c. Not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results for the diagnosis or treatment of that patient's illness, injury, or disease, or its symptoms; and

    d. Not part of or associated with scholastic education or vocational training of the patient; and

    e. In the case of inpatient care, able to be provided safely only in the inpatient setting.

18. On January 28, 2017, Mr. Poggio traveled from the US to Argentina.

19. Prior to his departure, Mr. Poggio, who was 58 years old, underwent a routine medical examination with his primary care physician and presented with no health anomalies.

20. On February 10, 2017, Poggio experienced a sudden onset of debilitating symptoms, including difficulty swallowing, dizziness, and diarrhea, for which he promptly sought medical treatment and was subsequently admitted to the Hospital Privado de Comunidad (HPC) in Mar Del Plata, Argentina. He remained an inpatient there until June 25, 2017.

21. On February 11, 2017 he developed hypercapnic respiratory failure and was connected to mechanical ventilation. Over the next few days his condition worsened.

22. Poggio developed severe quadriparesis, persisting ophthalmoparesis, and bilateral palpebral ptosis. He was also diagnosed with Guillain Barre Syndrome.

23. While in the Argentinian hospital Poggio received an MRI and CT, an electromyography, a cycle of EV gamma globulin with no clinical response, followed by a second. He received a percutaneous tracheostomy and five sessions of plasma exchange, with no clinical improvement.

24. His condition became more complicated when Poggio developed nosocomial infections: ventilator-associated pneumonia and a urinary tract infection. He also suffers from dysautonomia with orthostatic hypotension. Due to all or a combination of the above conditions, Poggio could not be taken off the mechanical ventilator.

4

25. As an additional consequence, Poggio developed a mood disorder, including anxiety and depression. He also developed severe bed sores.

26. HPC is an Urgent Care Unit, which was not equipped or staffed for the necessary continued treatment of this patient. They managed Poggio's GBS to the extent feasible given their available technology and staffing, but they were unable to provide the complex type of care he came to require.

27. As with most GBS patients, his condition required the unique type of care that can be provided in an Inpatient Intensive Care Unit until stabilized, followed by an Acute Inpatient Rehabilitation Facility specializing in neuromuscular diseases, for MD supervision, nursing, and rehabilitation (speech, occupational, and physical therapies).

28. According to Poggio's attending physicians these services were unavailable to Poggio in the region and the recommendation was to transfer him to UCSD in San Diego, California where he could receive the care he required.

29. As a result of the Guillain Barre Syndrome (GBS), Poggio had temporary quadriplegia, with minimal movement in his hands. He had severely diminished muscle tone/strength and required a mechanical ventilator to breathe. He was unable to eat, see, or speak independently His subsequent condition, including full thickness Stage 3 ulcers & chronic infection, required a unique type of complex care that could only be provided in a specific Inpatient Intensive Care Unit until he was stabilized, followed by an Acute Inpatient Rehabilitation Facility specializing in neuromuscular diseases.

30. These were the immediate and near- uture services required, for which HPC was neither staffed, nor equipped, nor were there regional facilities that would or could provide these services:

- Physical therapy at least 3 times daily. HPC could only provide this service 2 – 3 times a week, maximum. He required physical therapy daily as he regained voluntary movement.
- Bed sore prevention and care requires a multidisciplinary wound care team, and HPC was neither staffed nor equipped to provide adequate prevention and care of bed sores. As a result, he endured Stage 3 bed sores on his tailbone and hip.

5

  HPC did not even stock the necessary technology & equipment, so his wife purchased a VAC from an offsite vendor for his wound care. However, they were not staffed to keep the patient turned to allow healing and prevent more ulcers from developing. The air mattress they used developed leaks which were "patched" with tape and the family grew more concerned as his condition worsened due to the lack of cleanliness. Mr. Poggio's family noted the air vents were filthy, for instance, and the patient continued to suffer chronic infections and continuous antibiotic therapy to combat it.

- Subsequent necessary ongoing therapies such as speech therapy, respiratory therapy, and occupational therapy were unavailable at HPC and as stated, the attending physician could not find another facility within the region that would either accept him or that had an available bed.
- Advanced medical technology, in general, was limited since HPC was a limited care facility. Mr. Poggio's attending physician was very clear in his communications to AXA agents that moving him to a US health care facility equipped to see him through his acute and extended care would facilitate a more beneficial long-term prognosis. Not only physically, but mentally and emotionally. It was noted that Mr. Poggio was suffering from depression and the effects of being away from his family and support system in the US.
- Mr. Poggio's wife was also beginning to suffer from the trauma of a lack of support and the continual mental and emotional toll of dealing with the AXA agents, who seemed not to comprehend or were ignoring the attending physician's repeated recommendations for Mr. Poggio's transfer to the US.

31. It was the unanimous consensus of his HPC medical team who had participated in his care and had reviewed this case that his immediate air ambulance transfer to UCSD Health (or similar facility in the US) was warranted and necessary to provide the minimum care required for this patient's health, safety, and welfare.

32. His prognosis was being compromised by remaining in Argentina due to the lack of infrastructure, staffing, and equipment needed for his continuing care.

33. Additionally, the Stage 4 ulcers on his body were a source of chronic infection, pain, and accompanying low-grade fever.

34. He was receiving continuous antibiotic therapy and pain medications to cope, but without proper staffing and facility to treat this, his overall health was compromised and declining.

35. During his hospitalization in Argentina, Poggio's family was in constant contact with BCBS's overseas agency, AXA Assistance USA, both by telephone and email, as was his attending physician in Argentina, regarding the need to return him to the US for appropriate medical care due to his declining condition.

36. Mrs. Debra Poggio was at Poggio's side throughout his medical care for GBS. She was by his side every day, for an average of 8 hours a day, for 10 ½ months while he was being treated at 4 different hospitals. During the first 9 months of his treatment, she made it possible for him to communicate with his doctors, nurses, therapists, hospital staff, insurance company, family and friends.

37. Poggio was paralyzed except for small movements of his fingers. He was conscious and aware of what was happening to him.

38. Mrs. Poggio would communicate with him by saying the alphabet to spell out words, it was very time consuming and hospital's staff was grateful to have her help. She would let them know Poggio's needs, his comfort levels, his concerns, and his thoughts. Her goal was to work with hospital staff to keep Poggio comfortable, mentally and physically stimulated and to help with his overall care.

39. After three months of treatment at the hospital, he continued to suffer from severe quadriparesis, opthalmoplegia, depression, and bilateral palpebral ptosis.

40. His treating doctors were becoming increasingly concerned about Poggio and the urgency of getting him to a facility equipped to treat his increasingly dire condition.

41. On May 9, 2017 a letter of necessity was addressed to the BCBS FEP from the four primary physicians treating Poggio at the Argentinian hospital, outlining his diagnosis and medical condition, and advising BCBS that he required transfer to a long term acute care hospital in an intensive care unit, and suggesting air evacuation to the United States.

42. His family was in constant contact with the BCBS overseas agency, AXA, and his

attending physician had several phone conversations and email communications with AXA doctors, who seemed to understand the need to repatriate Poggio due to declining health issues. However, the agents at AXA continued to deny the requests.

43. One of the reasons given for the declination to transfer Poggio to the US was that there were closer facilities available that could provide him with the appropriate medical treatment and therefore, under the terms of the Policy, air ambulance transfer services were not a covered benefit.

44. AXA advised Poggio's wife and medical providers that appropriate services were available in Buenos Aires. No closer facility that was available, willing, and equipped to treat Poggio was identified by the Plan, AXA, or OPM.

45. The attending physician explained that he could not find a bed in an appropriate facility and that his condition was such that no other facility would accept him. The attending physician sent several emails and letters to AXA, but they continued to deny the transfer to the US, stating that the patient would have to self-pay, even though it was clearly within the Plan's guidelines.

46. On May 31, 2017 Poggio's attending physician wrote an email to BCBS, advising them that his condition remained concerning, with continuous requirement of mechanical ventilation, and that he required care in an intensive care unit. He also advised BCBS that he contacted the recommended facilities (by AXA) in Buenos Aires and was informed that either they did not have a bed available, did not have an agreement with AXA, or were unequipped to accept him as a patient due to his condition, including the fact that he required a ventilator.

47. Poggio's physician in the US also advised against transfer to another hospital in Buenos Aires. Transfer to any of the recommended hospitals in Buenos Aires would have been detrimental to the health of Poggio. The transportation to Buenos Aires itself was also a concern, as the trip would be long and risky for Poggio's condition.

48. On June 23, 2017 Poggio's attending physician wrote another email to BCBS, advising them of his worsening condition, which included development of sepsis, daily fever and continuous requirement of vasopressors. He was in septic shock. His psychological condition

8

remained impaired as well.

49. These complications necessitated the need for acute critical care support and neurological rehabilitation. The physician also advised BCBS that the recommended facilities in Buenos Aires did not have a bed available, did not have an agreement with AXA, or were unequipped to accept him as a patient due to his condition, including the fact that he remained on mechanical ventilation.

50. No closer facility that was available, willing, and equipped to treat Mr. Poggio was identified by the Plan, AXA, or OPM.

51. Poggio required medical care that would be provided in an Inpatient Intensive Care Unit until his condition was stabilized, followed by an Acute Inpatient Rehabilitation facility that specialized in neuromuscular diseases. These facilities and medical services were unavailable to Poggio in the country he was hospitalized in.

52. Given that there were no other facilities equipped to adequately treat Poggio's condition, and because the hospital in Argentina was not equipped to treat him, pursuant to the Policy, benefits for air transport to the US should have been covered under the Policy.

53. All of Poggio's treating physicians in Argentina, who were intimately familiar with the services their hospital could provide, as well as other nearby facilities, were of the opinion that immediate air ambulance transfer to the US was warranted and medically necessary and that without such transfer, his condition would continue to deteriorate. His condition and prognosis for improvement and/or recovery was being compromised by remaining in Argentina and being denied the appropriate medical treatment he required.

54. At the recommendation of Mr. Poggio's attending physician, who sent multiple urgent letters requesting emergency transfer to the US, his family decided that they could no longer jeopardize the patient's long-term wellbeing by waiting any longer. After 5 months of unsuccessfully seeking help from Poggio's insurer while his health significantly declined, Poggio's family contacted a physician at UCSD Hospital in San Diego, California, who arranged to reserve an ICU bed upon the patient's arrival via air ambulance. UCSD recommended three air ambulance services.

9

55. The family arranged for air ambulance services and Poggio's transfer to the U.S. with Continental Medical Transport LLC, dba Jet Rescue. As part of that agreement, Poggio's family paid Jet Rescue a $96,000 deposit, using borrowed funds and multiple credit cards.

56. As part of Poggio's agreement with Jet Rescue, he permitted them to bill all insurance or benefit plans from which he may be entitled to benefits and agreed that any funds received by Jet Rescue were to be applied to the total billed charges for their air transportation services.

57. On June 25, 2017 Poggio was transported via air ambulance from Argentina to the United States.

58. Once under the appropriate medical care and expertise of UCSD, Poggio's condition finally started to stabilize and improved rapidly.

59. On July 6, 2017 he was transferred to the next level of care at Kindred Brea long term critical care facility, where he continued to improve until his discharge at the end of November 2017.

60. From there, he participated in the St. Jude rehabilitation program for a month and was discharged to his family in December. Since then he has undergone in-home physical therapy. He is walking, talking, and regaining strength in atrophied muscles, and a full recovery is expected.

61. A claim for payment of the air ambulance services was submitted to the Plan on or about October 11, 2017 by Jet Rescue for total charges of $1,245,690.00.

62. The claim was processed by the Plan on November 28, 2017 and all charges were denied on the basis that the medical services were determined to be not medically necessary, or those that do not provide the level of care appropriate for his condition. No closer facility that was available, willing, and equipped to treat Mr. Poggio was identified.

63. On February 27, 2018 a request for reconsideration was submitted to the Plan by a Patient Advocate who had been hired by Poggio's family to appeal the denial decision.

64. On or about March 15, 2018, the Plan forwarded the case to the Plan's Medical Director, James King, MD, for an expedited medical necessity review, who determined that the air ambulance transport was not medically necessary pursuant to the language and terms

of the Policy because closer facilities were available for transport. No such facility was identified, yet the Plan upheld the denial of benefits.

65. On or about May 18, 2018, the Plan's Appeals department upheld the Adverse Benefit Determination and subsequent denial for reconsideration. Again, no closer facility that was available, willing, and equipped to treat Poggio was identified.

66. On June 8, 2018, Poggio's patient advocate sent correspondence to OPM on Poggio's behalf disagreeing with the May 18, 2018 decision and requesting reimbursement.

67. On January 2, 2019, Defendant OPM upheld the decision. OPM likewise did not identify a closer facility or provider that was available, willing, and equipped to treat Poggio.

## C. Claim for Denial of Health Benefits (FEHBA)

68. The air ambulance transport and subsequent treatment services provided to Poggio were medically necessary and appropriate for his condition and constituted covered services for which payment was due under the Plan.

69. Defendant's letters rejecting Plaintiff's multiple appeals show that Defendant did not fulfill its statutory responsibility to review Plaintiff's claims and whether the Plan correctly applied the terms as set forth in the brochure in denying the claim, instead merely rubber-stamping the Plan's denial.

70. Neither the Plan nor Defendant addressed any of the points highlighted in Plaintiff's appeal letters, including identifying any closer treatment facilities that were available and able to treat Poggio other than those that Poggio's treating providers checked and informed BCBS were not able or willing to take Mr. Poggio.

71. Defendant's decision upholding the Plan's denial was arbitrary, capricious, an abuse of discretion, unsupported, and contradicted by substantial evidence and the opinions of Plaintiff's various treating doctors, who repeatedly and emphatically explained the flaw in the denial's reasoning. The decision should be set aside pursuant to 5 U.S.C. § 706.

72. Plaintiff is entitled to a court order under 5 U.S.C. § 706 and 5 C.F.R. § 890.107 compelling Defendant to require the Plan to pay the claim for benefits for Poggio's air ambulance transport and medical services in accordance with the Plan's terms.

**D. Claim for Costs and Attorneys' Fees (EAJA)**

73. As a result of Defendant's wrongful conduct, Plaintiff was forced to retain a patient advocate and an attorney and has incurred costs and attorneys' fees and expenses in an effort to obtain benefits to which he was entitled under the Plan.

74. Defendant's position was not substantially justified, and Plaintiff is entitled to an award of costs and attorney fees and expenses under 28 U.S.C. § 2412 upon compliance with the statutory requirements.

**E. Prayer for Relief**

WHEREFORE, Plaintiff requests judgment against Defendant:

a. Ordering Defendant to require the Plan to pay Poggio's claim in full, including benefits for Poggio's air ambulance transport services to UCSD in the amount of $1,245,690.00, in addition to any and all unpaid acute, long-term, and rehabilitative medical services Mr. Poggio received;

b. Awarding Plaintiff costs, expenses, and attorneys' fees incurred pursuant to 28 U.S.C. § 2412; and

c. Granting such other relief as the Court deems just and proper.

DATED November 2, 2020

DAWSON & ROSENTHAL, PC
KANTOR & KANTOR, LLP

*/s/ Sander R. Dawson*
Sander R. Dawson
Aaron Dawson
*Attorneys for Plaintiff Alberto Poggio*