JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| ALBERTO VINCENT POGGIO, | Case No.: SACV 20-02115-CJC (ADSx) |
| Plaintiff, | MEMORANDUM OF DECISION |
| v. | |
| UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, | |
| Defendants. | |

## I. INTRODUCTION

Plaintiff Alberto Poggio filed this action against Defendant United States Office of Personnel Management ("OPM") pursuant to the Administrative Procedure Act, challenging OPM's decision to uphold Plaintiff's insurer's decision to not pay for an emergency air transport that Plaintiff took from Argentina to the United States in June 2017.  (Dkt. 1 [Complaint].)  The Court has considered the parties' trial briefs, the voluminous Certified Administrative Record (the "CAR"), and the parties' arguments during their single day bench trial on June 29, 2022.  For the following reasons, the Court finds that OPM's decision was arbitrary and capricious and **REMANDS** the action to OPM for a determination of benefits owed.

## II. BACKGROUND

### A. Plaintiff's Health Insurance Plan

Plaintiff, a retired federal employee and retired Air Force Veteran, is enrolled in the BCBS Benefit Plan (the "Plan") under the Federal Employees Health Benefits Act. (Dkt. 24 [Defendant's Answering Brief, hereafter "Answering Br."] at 1; Dkt. 23 [Plaintiff's Opening Brief, hereafter "Opening Br."] at 5.)  The Plan states that "[f]or transport services you receive overseas, we provide benefits for transport services to the nearest hospital equipped to adequately treat your condition when the transport services are medically necessary."  (Dkts. 29-32 [Certified Administrative Record, hereafter "CAR"] 126.)

The Plan defines medical necessity as "health care services that a physician, hospital, or other covered professional or facility provider, exercising prudent clinical

judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease, or its symptoms, and that are:

    a. In accordance with generally accepted standards of medical practice in the United States; and

    b. Clinically appropriate, in terms of type, frequency, extent, site, and duration; and considered effective for the patient's illness, injury, disease, or its symptoms; and

    c. Not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results for the diagnosis or treatment of that patient's illness, injury, or disease, or its symptoms; and

    d. Not part of or associated with scholastic education or vocational training of the patient; and

    e. In the case of inpatient care, able to be provided safely only in the inpatient setting." (*Id*. 151.)

### B. Plaintiff's Critical Health Situation

In January 2017, Plaintiff and his wife took a trip to Argentina. Soon after, Plaintiff developed a sudden onset of symptoms, including difficulty swallowing, dizziness, and diarrhea. (*Id*. 5390.) On or around February 10, 2017, Plaintiff was hospitalized at the Hospital Privado Comunidad ("HPC") in Mar Del Plata, Argentina. (*Id*. 5602.) Plaintiff—who was relatively healthy prior to travelling to Argentina—was diagnosed with Guillain-Barre Syndrome, a rare immune disorder. (*Id*. 4160.) To the extent they know, the parties have not made clear to the Court the cause of Plaintiff's diagnosis.

The CAR tells a rather bleak, life-threatening picture of Plaintiff's condition while at HPC.  His treating physicians wrote a series of letters explaining his dire condition.  On May 9, 2017, Drs. Gonzalez, Esperatti, Romano, and Godoy of HPC wrote to BCBS.  (*Id*. 4160-61.)  They explained that Plaintiff had paralysis in his upper limbs and eyes and "hypercapnic respiratory failure," which required mechanical ventilation.  (*Id*.)  The doctors stated that Plaintiff "has remained without clinical improvement during the course of his stay[.]" (*Id*.)  Instead, he developed infections at HPC, including "ventilator-associated pneumonia and urinary tract infection."  (*Id*.)  The doctors stated that Plaintiff "will require long-term care in an ICU."  (*Id*.)  They suggested air evacuation to the United States.  (*Id*.)

On May 31, 2017, Dr. Esperatti wrote in an email to BCBS's overseas agent AXA Assistance USA, Inc. ("AXA") that "[t]he clinical condition of [Plaintiff] has not had significant changes, with severe quadriparesis and continuous requirement of mechanical ventilation."  (CAR 4226.)  Dr. Esperatti further noted that Plaintiff required "vasopressors due to hemodynamic failure[.]"  (*Id*.)  Dr. Esperatti insisted Plaintiff required "care in an intensive care unit for chronic patients."  (*Id*.)  Dr. Esperatti also stated that he looked into alternative Argentine hospitals recommended by AXA: Clinica Basilea and Clinica ALCLA.  (*Id*.)  The first turned Dr. Esperatti down because they had no agreement with AXA.  (*Id*.)  The latter had no available beds.  (*Id*.)

On June 23, 2017, Dr. Esperatti wrote another letter explaining that Plaintiff had made no improvements and, indeed, had gotten worse.  (CAR 4233.)  He explained that Plaintiff was in septic shock.  (*Id*.)  He had apparently developed a sepsis and daily fever.  (*Id*.)  His need for vasopressors had also gone "from transient to continuous."  (*Id*.)  According to Dr. Esperatti, Plaintiff required "ACUTE critical care support" and "complex and multidisciplinary" care.  (*Id*.)  Dr. Esperatti mentioned two additional possible alternative Argentine hospitals: Clinica del Parque and Fleni.  (*Id*.)  The former

had not replied to Dr. Esperatti in two weeks. (*Id*.) The latter "[did] not receive patients ON mechanical ventilation." (*Id*.)

That same day, Plaintiff entered into an agreement for air ambulance services with Jet Rescue for emergency air transport to the United States. (*Id*. 4181-90.) Dr. Esperatti also filled out a medical necessity form in relation to Plaintiff's agreement with Jet Rescue, wherein Dr. Esperatti noted that Plaintiff "require[d] [a] higher level of care[.]" (*Id*. 5759.) Plaintiff was transported from HPC to UC San Diego Health ("UCSD Health") on June 25, 2017. (*Id*. 5919-30.) Dr. Lemkuil at UCSD Health took notes on Plaintiff's condition on June 26, 2017. (*Id*. 1438.) Plaintiff was classified as a "critically ill patient" due to a "neurologic injury" with a "high probability of causing life-threatening deterioration." (*Id*. 1443.) Dr. Lemkuil confirmed Plaintiff's GBS diagnosis, and noted complications due to "infection and skin breakdown[,]" including a "[d]eep sacral…wound[.]" (*Id*. 1438.) Indeed, photos were taken of Plaintiff's various bed sores at UCSD Health. (*Id*. 4044-46.) The wounds were quite gruesome, including, but not limited to, a large, gaping, and clearly infected hole at Plaintiff's lower back. (*Id*. 4046.) Plaintiff's eyes were "sluggish," and he was still unable to speak or move his limbs. (*Id*. 1438.) Plaintiff was also still relying on a mechanical ventilator. (*Id*. 1440.) Plaintiff's doctors at UCSD Health noted that after several procedures at HPC, Plaintiff had made "slight improvement followed by regression." (*See id*. 1444.) Plaintiff was discharged from UCSD Health to a skilled nursing facility on July 6, 2017, or eleven days after checking in. (*Id*. 4312.)

C.   **Plaintiff's Efforts to Seek Reimbursement for Transport to U.S.**

On June 25, 2017, Jet Rescue submitted a claim to BCBS for $1,245,690. (*Id*. 5749.) BCBS denied the claim, stating in conclusory fashion: "this service is not medically necessary." (*Id*. 5998.) On February 6, 2018, Plaintiff sought reconsideration

of BCBS' determination. (*Id*. 183.) In response, BCBS forwarded Plaintiff's case information to Dr. James King and Dr. Bruce LeForce. Dr. LeForce provided a curt analysis that stated "[a]ppropriate facilities are available in Argentina for treatment of [Plaintiff's] condition" and that Plaintiff "received no therapies at the receiving facility that are not available at the initial facility." (*Id*. 5945.) Dr. LeForce repeated several times his conclusion that there were appropriate facilities available in Argentina. (*Id*.) He also concluded that Plaintiff and his family decided on emergency air transport to the U.S. for their own convenience. (*Id*.) Dr. LeForce did not mention which hospitals in Argentina were available and capable of treating Plaintiff. Nor did Dr. LeForce mention how he arrived at the conclusion that HPC had available all the therapies that Plaintiff ended up receiving at UCSD Health.[1] Dr. King did not explain himself. On May 23, 2018, BCBS determined once more that the air transport was not medically necessary. (*Id*. 4456.)

Plaintiff appealed BCBS's decision to OPM on June 8, 2018. (*Id*. 4442-43.) On November 21, 2018, at OPM's behest, BCBS authored an "Explanation of Denial Report." (*Id*. 4427.) The report did not add much to BCBS's prior writings. BCBS wrote "[i]t was determined that appropriate rehabilitation facilities are available in Argentina." (*Id*. 4430.) On January 2, 2019, OPM issued a final letter of decision, upholding BCBS's denial. (*Id*. 165.) OPM explained its decision in a single sentence, stating "our Physician Consultant reviewed the documentation submitted in support of your appeal and determined the following: *The air ambulance transport was not medically necessary*. Therefore, we must concur with [BCBS]." (*Id*.) OPM did not explain why the air ambulance was not medically necessary in its denial letter. (*Id*.)

---

[1] In the initial version of Dr. LeForce's report, he did not reach the conclusion that HPC had available all the therapies used at UCSD Health. (*Id*. 5933.) Instead, he focused on the availability of facilities other than HPC in Argentina. (*Id*.)

The "Physician Consultant" referenced in OPM's denial letter is Dr. Jon Glass. The substance of Dr. Glass's Medical Review Analysis Report is a single page. (*Id.* 166-69.) In so many words, Dr. Glass opined that the air ambulance transport was not medically necessary because the care Plaintiff required was available in Argentina and Plaintiff could have received that care in Argentina, stabilized, and returned to the United States "by standard means." (*Id.* 169.) Dr. Glass stated that Plaintiff took the air ambulance for his own "convenience." (*Id.*) Dr. Glass stated there was "no rationale" as to why Plaintiff could not have been stabilized in Argentina. (*Id.*)

## III.  LEGAL STANDARD

Under the APA, a reviewing court must set aside a federal agency decision that is "arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Villa View Community Hospital, Inc. v. Heckler*, 720 F.2d 1086, 1090 (9th Cir. 1983) (*citing* 5 U.S.C. § 706(2)). "The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations removed). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* On judicial review, an agency's "[u]nsubstantiated or bare assumptions will not be credited." *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 31 F.4th 1203, 1207 (9th Cir. 2022) (internal quotations removed); *see also Nat'l Parks Conservation Ass'n v. U.S. EPA*, 788

F.3d 1134, 1143 (9th Cir. 2015) ("[U]nexplained assertions…unsupported by any explained reasoning" are "arbitrary and capricious[.]")

OPM's decision "can be upheld only on a ground upon which it relied in reaching that decision." *Vista Hill Foundation, Inc. v. Heckler*, 767 F.2d 556, 559 (9th Cir. 1985); *see also Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981) ("[T]he *post hoc* rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action."). "The rule barring consideration of *post hoc* agency rationalizations operates where an agency has provided a particular justification for a determination at the time the determination is made, but provides a different justification for that same determination when it is later reviewed by another body." *Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 511 (9th Cir. 1997). Further, the Court's review here must be limited solely to the CAR. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973). In suits such as the present case, prevailing plaintiffs are limited to an order directing the agency to require the insurer to pay the amount of benefits in dispute. *See Botsford v. Blue Cross and Blue Shield of Mont., Inc.*, 314 F.3d 390, 397 (9th Cir. 2002); 5 C.F.R. § 890.107(c).

## IV. DISCUSSION

OPM could not seriously argue that its decision, standing alone, would pass muster under the arbitrary and capricious standard. Once more, OPM offered a single sentence explanation that simply states Dr. Glass's conclusion at its highest level of abstraction: "*The air ambulance was not medically necessary*." (*Id*. 165.) But even if the Court considers Dr. Glass's report as incorporated into OPM's decision by reference, *see WildEarth Guardians v. Haaland*, 561 F. Supp. 3d 890, 898 (C.D. Cal. 2021), OPM's decision would still fail to pass muster under the arbitrary and capricious standard. Dr. Glass concluded that Plaintiff "could have continued in intensive care in Argentina for

the remaining approximately 12 days" followed by discharge and transport to the United States by more standard means and that Plaintiff's decision to take an air ambulance to the U.S. was for his own "convenience."[2] (*Id*. 169.) According to Dr. Glass, "the same care could have been provided in Argentina." (*Id*.) In one sentence, Dr. Glass stated that Plaintiff "*had been stabilized* with regard to his hemodynamic abnormalities and other critical care concerns." (*Id*. [emphasis added].) In the very next sentence, Dr. Glass stated "[t]here was no rationale as to why [Plaintiff] could not *have been stabilized* from a quick critical care and hemodynamic standpoint in Argentina." (*Id*. [emphasis].) Dr. Glass concludes: "The completion of critical care, which required less than two weeks per the UCSD notes, could have been completed in Argentina without affecting [Plaintiff]'s health, and *once stabilized* and no longer needing intensive care, he could have been transported via standard means to the United States." (*Id*. [emphasis added].)

The Court is left to wonder: which is it? First, Dr. Glass stated Plaintiff had already been stabilized. Then he stated that Plaintiff's stabilization could have been achieved in Argentina with just a bit more time there. Those ideas are contradictory and cut against the credibility of Dr. Glass' report. At any rate, both of these conflicting narratives are belied by the CAR. As to Dr. Glass's assertion that Plaintiff "had been stabilized with regard to his hemodynamic abnormalities and other critical care concerns," the Court points to the June 23, 2017 letter from Dr. Esperatti, who wrote that Plaintiff's condition had seen no significant changes or improvements since his May 31, 2017 email, wherein he explained Plaintiff required "vasopressors due to hemodynamic failure." (*Id*. 4233, 4226.) In fact, Plaintiff's hemodynamic issues had worsened since the May 31, 2017 letter, as Plaintiff had gone into septic shock, requiring the

---

[2] Dr. Glass believes that because Plaintiff was stabilized in 12 days at UCSD Health, that means he would have been stabilized at HPC within the same timeframe. OPM repeats this theory in their trial briefing: "Plaintiff could have continued in intensive care at the hospital in Argentina for the remaining 12 days of his approximately four-month hospital stay followed by discharge and transfer by a commercial airline to a rehabilitation or long-term acute care facility." (Answering Br. at 1.)

"continuous" rather than "transient" use of vasopressors. (*Id*. 4233.) According to Dr. Esperrati on June 23, 2017, Plaintiff required "ACUTE critical care support." (*Id*.)

If Dr. Esperrati's letter was not enough proof that Plaintiff had *not* "been stabilized with regard to his hemodynamic abnormalities and other critical care concerns" at HPC, the Court turns to the notes maintained by UCSD Health. First, it would have been odd for UCSD Health to admit a supposedly stabilized patient to their neurocritical care unit. (*See id*. 1443.) And on June 26, 2017, in no uncertain terms, Dr. Lemkuil at UCSD Health explained that Plaintiff was "critically ill" and that his "neurological injury has a high probability of causing life-threatening deterioration." (*Id*. 1443.) Dr. Lemkuil also noted Plaintiff's deep sacral wound—or the large and festering hole in Plaintiff's back, *see id*. 4046—and Plaintiff's multiple other infections. (*Id*. 1438.) Dr. Glass makes no mention of the deep, infected wounds Plaintiff had developed at HPC and why he would not categorize those wounds as a component of Plaintiff's "critical care concerns."

Dr. Glass's assertion that Plaintiff could have been stabilized in Argentina also finds no support in the record. To the extent that Dr. Glass meant Plaintiff could have been stabilized at HPC, the very people who work there vociferously begged to differ. Plaintiff's HPC doctors were clear in their communications that Plaintiff was not making any progress. On May 9, they wrote that Plaintiff had shown "no clinical improvement during the course of his stay at the ICU." (*Id*. 4162.) Instead, he had developed infections at HPC like "ventilator-associated pneumonia" and "urinary tract infection." (*Id*.) In the words of HPC's doctors, Plaintiff needed "physicians who specialize in rendering the appropriate treatment." (*Id*.) On May 31, 2017, Dr. Esperatti wrote that Plaintiff's condition had not improved and that he required vasopressors due to hemodynamic failure. (*Id*. 4180.) Dr. Esperatti wrote "[i]t is necessary to clarify that he does not require less care (in terms of complexity), but he requires 'different care' than

currently receives."[3] (*Id.*) And finally came Dr. Esperatti's desperate June 23, 2017 letter, wherein he described Plaintiff's septic shock and associated need for continuous vasopressors, daily fever, and need for acute critical care support. (*Id*. 4233.) Again, Plaintiff also left Argentina with gruesome bedsores, which ostensibly caused his septic shock. (*See id*. 4046.) UCSD Health's notes are consistent with HPC's account that Plaintiff was making no improvements in their care, as UCSD Health physicians noted a series of "slight improvement[s] followed by regression[s]" throughout Plaintiff's time at HPC. (*See id*. 1444.) And finally, there is the very basic timeline to contradict Dr. Glass's conclusion: Plaintiff was at HPC for over four months and UCSD Health for less than two weeks. After four months of Plaintiff not only not improving, but seemingly getting drastically worse at HPC, Dr. Glass and OPM arrive at an improbable conclusion: Plaintiff could have simply continued his critical care at HPC, where the HPC doctors would have achieved the same results as those achieved at UCSD Health and in the same short time, despite having failed to achieve those results in over four months.[4]

To the extent that Dr. Glass and OPM meant to say that Plaintiff could have been transferred from HPC to another hospital in Argentina, Dr. Esperatti had ruled out all four possible alternative hospitals that he knew of. In his June 23, 2017 letter, he explained the status of his inquiry into Clinica del Parque, Clinica Fleni, Clinica ALCLA, and Clinica Basilea. (*Id*. 4233.) He wrote that Clinica Basilea was not possible because it did not have an agreement with AXA,[5] Clinica ALCLA had not replied to his request in three

---

[3] Obviously, there is a bit of a language barrier associated with this case, as the HPC doctors had to do their best to write in a non-native language. But the basic thrust of what Dr. Esperatti was saying is understandable: Plaintiff needed a different kind of care than he was receiving at HPC.

[4] Samantha Ready, a patient advocate writing to BCBS on Plaintiff's account, provided some examples as to how HPC was understaffed or underequipped to deal with Plaintiff's special needs. For example, she explains that Plaintiff's wife had to purchase a device for the vacuum assisted closure of Plaintiff's bed sores because HPC did not have the device. (*Id*. 4468.) She also explained that HPC did not have the requisite staff to keep Plaintiff turned, so as to allow his deep bed sores to heal. (*Id*.)

[5] In an earlier communication, Dr. Esperatti wrote that Clinica Basilea "only accepts patients from a limited number of insurances with whom they have an agreement." (*Id*. 4226.)

weeks, Clinica del Parque had not replied to his request in two weeks, and Clinica Fleni did not receive patients on ventilators, like Plaintiff. (*Id.* 4233.)

OPM writes that "Dr. Esperatti had ruled out two of the four facilities, but he had not made contact with two of the facilities[.]" (Answering Br. at 15.) OPM argues that this means "the record does not establish that ALCLA and Del Parque were not available[.]" OPM's argument ignores the exigencies Plaintiff, his family, and the HPC doctors faced. The record shows that Dr. Esperatti tried to contact Clinica ALCLA and Clinica del Parque, but that they did not respond to him. Faced with a patient that was clearly in dire condition, it would have been imprudent for Dr. Esperatti to have continued contacting non-responsive hospitals instead of acting decisively to reach a conclusion that Plaintiff urgently needed to leave HPC. But more importantly, OPM's argument confuses the applicable standard. OPM writes that it does not have any burden to prove that the four other Argentine hospitals were unavailable. (Answering Br. at 15.) But OPM's decision relies entirely on Dr. Glass' report, which itself relies on the bald assertion that appropriate care was available in Argentina. Dr. Glass offers no explanation for why he believes this to be so. He points to no documentation and offers no names for other available hospitals. If OPM's basis for denial is that there was appropriate care available in Argentina at hospitals other than HPC,[6] OPM's manageable burden is to show that there is *some* substantiation in the record for that assertion. *Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, 31 F.4th 1203, 1207 (9th Cir. 2022) ("Unsubstantiated or bare assumptions will not be credited.") (internal quotations removed). Even a shred of evidence that Clinica ALCLA and Clinica del Parque were available might suffice. But that evidence finds no place in the CAR. The only evidence the Court has with respect to the four Argentine hospitals other than HPC is that Dr. Esperatti attempted to contact those hospitals and that they either rebuffed him or failed

---

[6] The Court has already explained why the record belies the implication that HPC was up to the job.

to respond. Considering that evidence, how can the Court concur that Plaintiff—a "critically ill" patient at the time, to borrow UCSD Health's assessment—could have been transferred to one of these hospitals?[7]

OPM argues that neither it nor Dr. Glass "simply ignored" Dr. Esperatti's opinion. In OPM's view, the fact that Dr. Glass listed Dr. Esperatti's correspondence as something that he reviewed before rendering his decision and the fact that OPM states that it viewed the entire CAR means that Dr. Esperatti's important evidence did not go ignored. But neither OPM nor Dr. Glass made any attempt to contend with the substance of Dr. Esperatti's communications, and that silence is glaring. Dr. Esperatti practices medicine at HPC, a hospital in Argentina. He explained that his own facility was inadequate and there were not adequate facilities available nearby. With no explanation as to how they know HPC's capabilities or the medical landscape in Argentina, Dr. Glass and OPM disagree with Dr. Esperatti. Dr. Esperatti also had eyes on Plaintiff and opined that Plaintiff had made no improvements in months and was instead in dire, critical condition, an account that comports with UCSD Health's notes. With no explanation as to what in the record would have led him to conclude otherwise, Dr. Glass states that Plaintiff "had stabilized" or, in contradiction, was on the brink of stabilization. The Court is not putting on OPM or the physicians with which it consults a burden to explain away every piece of evidence that cuts against their conclusion. But OPM's decision and Dr. Glass' report cross the line into "unexplained assertions…unsupported by any explained reasoning[.]" *See also Nat'l Parks Conservation Ass'n v. U.S. EPA*, 788 F.3d 1134, 1143 (9th Cir. 2015).

---

[7] If OPM is attempting to argue that facilities may have been available in countries other than Argentina that were closer to HPC than UCSD, (*see* Answering Br. at 15), that argument is foreclosed as a *post hoc* rationalization, *see Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981), because neither OPM nor Dr. Glass touched on that point in the CAR, (*see* CAR 166-69).

OPM also argues that Plaintiff is expecting it to accord special weight to the opinions of the HPC physicians and forcing it to credit those opinions over the opinion of Dr. Glass. (Answering Br. at 14.) In this vein, OPM cites *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) for the proposition that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation[.]" The Court has no problem with that proposition. But, in the context of this case, the key term in that statement of the law is "reliable evidence." For the reasons explained above, and with due respect to Dr. Glass, the Court does not find Dr. Glass' report reliable. Dr. Glass offered only bare conclusions that are not only unexplained but belied by the CAR. He stated Plaintiff was already stabilized at HPC, without explanation. HPC and UCSD Health stated Plaintiff was in critical condition and provide examples for that conclusion. Dr. Glass stated Plaintiff could have been quickly stabilized without explaining why he believed that and without acknowledging how this claim contrasted with his claim that Plaintiff was already stabilized. That contradicts HPC's account that Plaintiff had made no improvement in months, and UCSD Health's notes that Plaintiff had consistently regressed after slight improvement while at HPC. The internal contradictions contained in Dr. Glass' report, the contradictions between the report and the reports of Plaintiff's treating physicians at both HPC and UCSD Health, and the fact that OPM has not cited any documents in the CAR that are consistent with Dr. Glass' bare conclusions renders his report unreliable.[8] And far from requiring OPM to "accord special weight" to Dr. Esperatti's pleadings, the Court is simply asking OPM to give his opinions some consideration more than no consideration at all.

---

[8] OPM might argue that Drs. King and LeForce, BCBS's reviewing doctors, agreed with Dr. Glass. Dr. King offered no explanation at all. And Dr. LeForce, like Dr. King, offered only bare conclusions with even less reasoning than Dr. Glass's report. OPM has strung together three doctors that essentially say: "Plaintiff was either fine or on the road to recovery." That is not good enough when the CAR is clearly contrary to those conclusions, and no amount of doctors repeating the same unsupported conclusion would lend the unsupported conclusion weight.

The Court understands its narrow role here. It understands that it has no authority to substitute its own reasoning for that of OPM when OPM articulates a rational connection between the CAR and its conclusion. And far be it from the Court to get into a medical debate with medical professionals. However, this is not a mere rubber-stamping process. OPM's decision on this very serious issue is a single sentence that defers to Dr. Glass without explanation. In turn, Dr. Glass makes bare conclusions without explanation or citation to evidence in the CAR. On the Court's review, the CAR strongly contradicts Dr. Glass' conclusions. OPM does not fulfill its role when, without further remark or explanation, it accepts the unexplained conclusions of a medical professional, especially when the CAR tilts so strongly against those conclusions. Taxpayers are paying BCBS. *See* 5 U.S.C. §§ 8906, 8909. BCBS cannot so blithely ignore strong evidence contrary to its desired outcome. And OPM cannot put the stamp of government approval on such an ill-supported benefits denial.[9]

\\
\\
\\
\\
\\
\\
\\

---

[9] In its trial briefing, OPM raises for the first time the Plan's exclusion of "[c]osts associated with repatriation from an international location back to the United States." (*Id*. 126.) The Plan defines repatriation as the "act of returning to the country of birth, citizenship or origin." (*Id*. 155.) But nowhere in OPM's decision does it mention that it was upholding BCBS's decision because Plaintiff's emergency transport qualified as uncovered repatriation. And in any event, costs that are medically necessary are not costs associated with repatriation. Because OPM's repatriation argument is a *post hoc* reason for denying benefits that is not part of OPM's denial decision, it cannot serve as a sufficient predicate for OPM's denial of benefits. *See Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981) ("[T]he *post hoc* rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action.").

## V. CONCLUSION

For the foregoing reasons, the Court **HOLDS** that OPM's decision was arbitrary and capricious. The CAR overwhelmingly shows that it was medically necessary for Plaintiff to take an emergency air transport to UCSD. The Court **REMANDS** this case to OPM for a determination of the amount that Plaintiff should be reimbursed for his claim in a manner consistent with the Plan and all applicable statutes and regulations.

DATED: July 6, 2022

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE